To the Fifth Circuit Court of Appeals we have two cases to be submitted today on oral argument beginning with United States v. Malagerio. Ms. Penrose? Good morning. May it please the court, my name is Mary Margaret Penrose and I am the 13th Justice Scalia reminded that when it comes to the Fourth Amendment the home is the first among equals. At the amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. This right would be of little value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity. Those are the words from Hardeen's. Exchange the phrase trawl for evidence with demand at gunpoint, he exits, and you have this case. If armed ICE agents can enter a man's property and order he exit his repose from just outside his door, the Fourth Amendment's strong protection afforded the home both at common law and under Supreme Court precedent becomes an empty promise. The District Court's denial of the motion to suppress marriage reversal in five distinct ways. First, the legal conclusion finding that Malagiaria was not seized in the home or within the cartilage is incorrect. Second, applying a subjective test for seizure by focusing on what Malagiaria was doing or thinking rather than what a reasonable person confronted with armed law enforcement officers surrounding his home at daybreak and commanding that person exit his home by name would feel whether that person would feel free to leave or terminate the encounter when they opened their door to see a shotgun pointed directly at them. Third, elevating five pages of dicta from a 1960 espionage case over the framer's original intent that the home is a sacred legal space. The District Court's ruling is contrary to the common law in place at the founding as described recently by the Supreme Court in 2021 in Lang v. California. Fourth, holding officers acted in objective good faith by relying on Abel's dicta which has withered under an unbroken line of Supreme Court cases protecting the home. The Supreme Court has continually required a judicial warrant issued by a neutral and detached magistrate before entering the home to make an arrest except when that person has been previously convicted such as a probationer or a prison escapee. But even here, the collaboration of two ordinary police officers and issuing an administrative warrant is not enough. Case after case protects the sanctity of the home and emphasizes the requirement of a judicial warrant. Why do you say that this was not within at least the curtilage? It was within the curtilage, Your Honor. It was within the curtilage, all right. Absolutely. Let me be crystal clear. The moment Mr. Malagiria opened his door and he saw a shotgun six feet from him as his name is being called, his first name, Paul, come out, he was seized in the doorway of his home. This is a home seizure. Oh, all right. Listen, I'm sorry. Let me go back to the curtilage and you're right. I think I said it backwards. So this was, it was a parking space that was near the trailer, but it was kind of a separate graveled area. Is that right? Your Honor. I'm talking about the vehicle, the truck. The vehicle, the truck was approximately six feet from the doorway. There's one entry and one exit point. This is a 12-foot trailer. It's a very small space. Where he was handcuffed, if we're going to the very latest possible point of seizure, and that's the point of handcuffed and arrest, then yes, that is within the curtilage. But if we're talking about the objective test, starting at Mendenhall and moving on to Brendlin, then the question becomes, would a reasonable person in the objective sense, when they hear at daybreak, numerous cars outside their doorway, look and see several armed officers? In fact, there's either six or eight. The record is somewhat unclear on that. He could see the officers before he opened the door? Is that what you're saying? I'm not sure that the record is clear on that, Your Honor, but I think what, what I think is very important from a legal and constitutional perspective is the moment that Mr. Amalegre opens his door. The record is crystal clear that a shotgun was pointed directly at him. Right, but what about before that, when he's in his house and did the agent say, I'm an ICE agent, come out? I don't believe we have clarity on that point because the only actual evidence besides the testimony of the officer is that video that this court has. It's roughly about two minutes and 21 seconds, and we're not sure whether that captures the entire interaction. What took him so long to come out? A man doesn't have to come out of his home. What took him so long to come out? I don't know that that's clear in the record, Your Honor, and that's one of the things I think that's important for this court to consider, which is the test for seizure is objective. What Mr. Amalegre was doing or thinking subjectively, even to the point of, you know, straightening his shirt, is constitutionally irrelevant if the court considers the Brendlin case where seizure, where in that particular case, the Supreme Court found that the passenger in a vehicle is seized when the vehicle is pulled over. Mr. Brendlin, who was the passenger, knew he was wanted for a probation violation. He actually, the facts of that case tell us he opened the door and then closed it, and the Supreme Court said that didn't matter because the question is objectively, what would a reasonable person sitting in a passenger seat think? Would they feel free to terminate the encounter or walk away? I'm trying to figure out what he was thinking when someone was knocking on his door at 7 a.m. saying to come out. What was he thinking? In the record, he said he was curious and he said he was terrified, but his subjective feelings are not responsive to the objective reasonable person, so I would presume the reasonably objective person living someone out in the country where this location is, coming down a dirt road where cars rarely come, and that is in the record, Mr. Malagiero said his interest was piqued because cars rarely come down this dirt road. He didn't come to the door for at least 60 to 90 seconds, and that's why the officers became more, their commands became more urgent. Did he say nothing for those 90 seconds? There's nothing in the record that tells us what he said, Your Honor. Well, to the extent that there's any of these facts that are unclear, we have to defer to the district court's findings, right? I think as far as the factual findings, the court is required to uphold those unless there's clear error, but when we're talking about the ultimate conclusions, including the constitutionality of the actions of the law enforcement, this circuit in U.S. v. Williams in 2018 said that the legal conclusions, including the ultimate constitutionality of the actions of law enforcement, is assessed de novo. So under the objective test that the court's obligated to apply for Fourth Amendment seizure, the finding of where Mr. Malagiero was seized is a legal conclusion. That's not a factual finding. Are there other questions at this point? Where is it that you say the Supreme Court has overruled or abandoned the language that you call dicta from the Abel case? Absolutely, Your Honor. Abel was decided in 1960. In 1961, the United States Supreme Court decided Silverman v. United States. In 1961, Mapp v. Ohio. In 1964, Stoner v. California. What did those decisions say, if anything, about Abel? To my knowledge, Abel has never been cited again in a United States Supreme Court opinion, and at least the dicta that we're talking about here, because when the court goes back to read the dicta of Abel, and it's both in the original brief and I believe in our reply brief, the court makes clear that that issue was precluded from assessment by the United States Supreme Court. It's not only not binding dicta, it's not even persuasive dicta. When you take the cases from 1961, Silverman and Mapp, 1964, Stoner v. California, which then expanded the protection of the home to hotel room, 1967, Cameron v. C, I'm sorry, Cameron v. Municipal Court and the C case, I think those two cases standing alone override Abel's dicta, because what they said is even for an administrative warrant, you need the judicial checkpoint. You need the court, not officers, determining whether there is probable cause. An important consideration for this court is that there were two officers, two main officers involved in issuing this warrant, Mr. Harshberger, Detective Harshberger and Officer Rowden. Detective Harshberger receives the initial tip, Mr. Malagieri is a possible overstay and may be causing mischief. He then goes to Officer Rowden and says, Officer Rowden, will you please investigate? Officer Rowden investigates. He then comes back to the same police officer, Detective Harshberger and says, here's my probable cause, issue the warrant. Detective Harshberger issues an administrative warrant. Then who are the two officers that are in charge of the arrest primarily? Harshberger and Rowden. The framers surely would not have envisioned a world where two police officers could circumvent the judicial process to invade the sanctity of the curtilage of a home or the actual threshold of a home. In Hardeen's, Justice Scalia emphasized that yes, a citizen can knock on a, I'm sorry, a police officer can knock on a door like any other citizen, but when that knock is not answered, as Judge Clement was asking, what was he doing from 69 seconds? There was no legal basis for those officers to enter. And when that knock was not answered, those officers had a constitutional obligation to turn and walk away. They could not demand at gunpoint that Mr. Malagieri exit the sanctity of his home. In order to do that, case after case after case has interposed a neutral and detached magistrate between the officer and the, I'm sorry, the individual. In the Stiegald case in 1981, the United States Supreme Court said the purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search. As we explained, the placement of this checkpoint between the government and the citizen implicitly acknowledged that an officer engaged in the often competitive enterprise of ferreting out crime may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interest in protecting his own liberty and the privacy of his home. Let me ask you a question. You said the agency didn't have a right to enter. Correct. After your client came out with hands up, he gave them permission to go search for the guns, to enter the house, and he showed them where the guns were. So why are you saying they didn't have the right to enter? They didn't have the legal right to enter when they knocked. They didn't. They didn't enter when they knocked. That is correct, Your Honor. One of the things I think that is really important to evaluate, particularly moved to the good faith argument of the officers. There is uncontroverted testimony that these officers knew you could not effectuate an administrative arrest warrant at a home. Officer Rowden, in violation of federal policy and federal legal training, intentionally designed this arrest to occur at the home. That was an operational risk he calculated. And then that operational risk included someone that is not permitted under federal law to be part of an administrative warrant arrest, and that's a Texas game warden. The court credited that presence due to the operational risk, but the operational risks were created by the ICE officers. And in Kentucky v. King, the United States Supreme Court said officers don't get to rely on exigent circumstances that they themselves create. And here the court should not defer to the good faith of these officers, particularly Officer Rowden. When he knew that federal policy, and it's in the record and the federal legal training that he testified under oath he was unfamiliar with, the test from Leon is would a reasonably objective officer know that what he was doing was proper? In Davis v. United States, Justice Alito indicated that police receive protection under the good faith exception when there's binding precedent. ABLE is not binding precedent. In fact, ABLE's dicta not only hasn't survived the test of time, but currently sits at odds with articulated federal policy and with federal legal training. As you I'm sure know, through the years there's been discussion in our case law, probably discussion going both ways as to how much we're bound by Supreme Court dicta. So it's not absolutely certain that we always should ignore Supreme Court dicta. Your Honor, I see my time is up. May I respond to the question quickly? Your Honor? Dicta that is persuasive and has weathered the test of time is dicta that should be embraced by this Court. But I'm not aware of any case in this circuit where the dicta has fallen as harshly as the dicta in ABLE at the sanctity of the home where this Court has set, despite subsequent Supreme Court case, particularly when Katz provided the seismic shift in Fourth Amendment doctrine, where this circuit has followed dicta that hasn't weathered the test of time. All right. You've saved time for a moment. Thank you, Ms. Pamos. Thank you. Ms. Grant? Good morning. May it please the Court. Amber Grant for the United States. The appellant, Mr. Malagirio, would have this Court believe that his arrest was drawn from the pages of some Hollywood movie script, but nothing could be further from the truth. The record shows this was a run-of-the-mill, typical immigration arrest executed pursuant to a duly, statutorily authorized immigration arrest warrant. The Court's Fourth Amendment inquiry starts, as it does in every case, with the good faith exception. This was a warranted arrest, so Mr. Malagirio has the burden of proving that the good faith exception does not apply. It was not an arrest, though, for what if that—for what would have been perceived as a criminal violation. And the criminal violation was possession of the weapons, but not his presence within the United States. Is that right? Correct. He was detained in anticipation of civil deportation proceedings pursuant to the immigration statute. So he was detained—detained, but not arrested. Is that—is that right? I want to—I want to understand—well, don't just shrug your shoulders. I mean, it's—it's an important distinction. Yes, Your Honor. He was arrested pursuant to the administrative arrest warrant as the Immigration and Nationality Act authorized. And that procedure has been upheld as constitutional, not only in ABLE, but in the very authorities that the appellant cites, camera and see. And I want to be very clear that the holdings of those cases are not what the appellant has represented to the court. The appellant bracketed the phrase judicial into her brief. That phrase does not appear in camera and see. Those cases specifically delineate a difference between administrative warrants, where Fourth Amendment reasonableness is satisfied by the congressional statutory limitations, as opposed to a criminal judicial warrant that requires a neutral and detached magistrate. The Supreme Court went on to hold specifically that administrative warrants satisfy the Fourth Amendment without the sanction of a neutral and detached magistrate. So camera and see support the government's position. You can find that holding in Griffin v. United States, which is relied on in the Lucas case that the government cites in its brief. That's at footnote five. The court specifically said you do not need a neutral and detached magistrate in the administrative context because these are civil proceedings. He was being arrested in anticipation of deportation. There is no claim here that probable cause was lacking as to his removability. There is no claim here that Harshberger was not authorized to sign the arrest warrant under the statute. The only claim here is that Malageria wants you to invoke a per se rule that administrative warrants can never be executed at the home. But this was a typical run-of-the-mill immigration arrest. But they're saying that's a policy of the government. How can it be good faith not to follow your employer's policy? Well, I disagree with that characterization. The record at 1209 has the operational risk assessment, which is the checklist they go through to determine how to effectuate the arrest. The testimony at page 490 to 91 was that it is standard operating procedure. The default is to effectuate these arrests at place of employment or place of residence. And for Malageria, Whitley Farms was both. It is only if five or more risk categories are indicated that the officers assess an alternative location for arrest. The policy that Malageria refers to is for the effectuation of these warrants inside the home, past the threshold of the door. Now, the reasonableness of that would be assessed on a case-by-case basis. Even that is not a per se rule. But approaching the home, knocking on the door, telling him, immigration, you need to come outside, is entirely in line with DHS policy and was fully sanctioned by the Supreme Court in Abel. Did they tell him, when ICE agent told him to come outside, did he say, come outside with your hands up? They said, come outside. And when there was a significant delay, they had what Agent Raymond testified they called a fatal funnel. That's a very dangerous period of time for law enforcement when they have commanded somebody to come outside and they don't. So as soon as they saw movement inside, come out, come out, and they saw the door open and they said, all right, hands up. Keep your hands up. So he was still in the house when they said, hands up? Or had he come out with his hands up? Was he responding to the ICE officer? Or did he just know to come out with his hands up? Oh, no, no. He opened the door and at that point they said, hands up. And that was for operational safety. That's standard operating. So hands up in the house before he came out the door? Oh, I believe it was when he opened the door. But the dispute— If you open the door, you either stay in or come out. When he opened the door, did he come out with his hands up? No, his hands were down. And the video, I believe it's at the 2.30 mark. You can hear the officer's commands go from, Paul, hands up, hands up, hands up. He was outside. Yeah, he was outside. He was not complying. The tenor of their commands demonstrate that there was a lack of compliance. The government maintains that seizure is sort of an ancillary issue. In this case, it's a very ancillary issue. It's an academic debate, seizure, heritage, because the good faith exception plainly applies. There is binding Supreme Court authority— How does the gun fit in all of this? I mean, you've got somebody who overstayed their welcome in the United States, and you've got a bunch of officers pointing guns. How is that appropriate? That was for—as the district court made a factual finding, it was strictly for operational safety. The video shows the guns were out for a maximum of 10 seconds. It was during the narrow time frame that he was exiting the home until the scene was declared safe. There was not only the issue of potential guns in the house, but the exotic animals. The video shows huge kennels all over this property. Whitley Farms was well known in the Leveland area for its exotic animals. It was unclear at that point if they were going to— Oh, they thought a tiger was going to come running at them, and they needed a gun for that? One of the immigration forms that Malagirio signed said that the cougar would stay in his home, so that's not an unreasonable risk for officers to be prepared for. The firearms were deployed for a very limited— not even deployed, unholstered for a very limited period of time to ensure officer safety, and then they were promptly replaced in the holster. I want to turn to Abel because there's no question the district court found that Abel condoned the use of the administrative warrant in this case, and I think it's a stretch to call the Supreme Court's language dicta. I think it's important to look at the strength of their tone. They said he doesn't raise whether the agents could have arrested him in this manner, because how could he? This type of arrest has the sanction of time, uncontested historical legitimacy. There's overwhelming historical legislative recognition of the propriety of administrative warrants for deportable aliens. The Supreme Court went on and on at length about how this process could not reasonably be questioned, and said of course he waived this issue below. This is such a long-standing practice. Abel has been cited by this court as recently as a couple of years ago. It was cited by the Smith case and upholding the immigration arrest in that case. The principles of Abel were adopted in camera and see, and this delineation between administrative warrants and judicial warrants is well established in both Supreme Court and Fifth Circuit precedent. So we have the noted quotation from our late colleague, Judge Tom Reveley, and I'm paraphrasing it just a little bit, because I don't have it in front of me, where he says, well, Fifth Circuit dictum is one thing, but Supreme Court dictum is something else, meaning that we should pay attention to Supreme Court dictum, even if it is dictum, the idea being that they can't cover every factual situation when they decide a case, but we should pay attention to the principles that the Supreme Court enunciates if it's mentioned in the opinion. I agree. Arizona versus the United States would present another opportunity for this court to take note of what could arguably be construed as dicta, and in that case, the Supreme Court spent pages and pages talking about this exact legislative scheme, discussing the extensive statutory requirements to secure an administrative arrest warrant, that there is extensive training required by the authorizing officer, by the officers who will effectuate the arrest, and the Supreme Court has explained that it's those statutory safeguards, Congress has the power to come up with those safeguards, and those stand in place of a judicial warrant to ensure Fourth Amendment reasonableness. That's why the administrative warrant was sufficient in this case, and there certainly wasn't any reasonable basis for an objectively reasonable officer who effectuates these arrests. The court in Arizona said 350,000 of these a year, at least in 2010, and standard protocol is to do it at the place of employment or place of residence. This happens every day. Agent Roden had five more arrests that day, was the testimony at the suppression hearing. This wasn't some remarkable occurrence. There was nothing extraordinary about the way Mr. Malagirio was taken into custody based on probable cause that he was not lawfully within the United States, and because any objectively reasonable officer would have relied on that administrative warrant, the good faith exception has to apply. The only issue in addition to that are the claims of subterfuge. The district court made a well-reasoned factual finding that the record simply could not support a finding of subterfuge. Under Club Retro, the court would have to find that the only purpose of securing the administrative warrant was to discover evidence of criminal activity, and the record here disproves that finding. Agent Roden initiated the immigration file after receiving the tip that Malagirio was here unlawfully. Agent Roden led the arrest operation. The HSI agents testified that they stayed 25 to 30 yards back during the duration of the arrest. They were just there as backup, and that intra-agency cooperation was something that they did every day. This was just how the agencies cooperated with one another. The first thing Roden did when he knocked on the door, immigration. The first thing he did when he handcuffed Malagirio, do you have any documents authorizing you to be in the United States? The first thing they did, do you have a passport or anything else that will demonstrate your citizenship? They booked him into immigration for an immigration hold. This was about his unlawful status in the United States. This case was not about discovering evidence of criminal activity, and because of that, this court should defer to the district court's well-reasoned factual findings that the record cannot support a finding of subterfuge. When you have well-established case law upholding the use of an administrative arrest warrant, when you have department policy that sanctions the manner of the way it was executed, when you have no contrary authorities, by my count, 22 to 24 cases cited by the appellant that she wants us to layer upon layer, none of which talk about administrative warrants, none of which talk about warranted searches, all dealing with the propriety of warrantless searches, to find that these officers were unreasonable, that's not the good faith exception. That's asking us to overturn decades from the time of the founders, as the Supreme Court put it in Abel, this has been a sanctioned practice. That would be an unreasonable outcome under the facts of this case. Once we apply the good faith exception, the only remaining issue is the voluntariness of his consent. The issue Mr. Malagirio raised in the district court was dramatically different than the one he brings on appeal. The record at page 56 shows that he testified at the suppression hearing, I didn't consent at all. I demanded to see a warrant. I told him they couldn't come in. They rummaged through my house. I didn't give any consent. That testimony wound up being the basis for a perjury finding and an obstruction of justice enhancement, as the record shows at 1231. The district court found that testimony to be incredible. The government put on affirmative evidence of voluntariness anyway. That's in the record at page 93 to 94. That evidence was in the form of Malagirio's conduct both before and during the search, his jailhouse phone calls, his signature on a written consent form, and the testimony of the three different officers at the suppression hearing that he was cooperative. He knew he had some immigration issues. He just wanted to make this go away. When did he sign the written form? That's unclear from the record. Each agent testified that he was handcuffed, so they surmised it was likely when he was taken back to the federal building, but it's unclear when. We know it was the day of the search. So in the event that he claimed in the moment his consent was somehow coerced, he still signed the written consent form at some point that day. That finding is reviewed for plain error because it was not raised or decided by the district court. The court noted at page 255 that voluntariness was not contested. So the government put on affirmative evidence of the voluntary nature of consent. Malagirio did not challenge it. This court should find that effective consent was rendered to enter the trailer and to conduct the limited search that they did. It was limited because Malagirio participated in it. He directed the officers to the lunch pail that had his passport and one firearm. Then he took him over to the sleeping area and helped him find the AR-15 and the long-arm rifle. That was the end of the search, and it was all done pursuant to his cooperation and consent. The suppression issues in this case were decided on a series of credibility determinations by the district court. The court was not relying on the body cam video as reliable as that evidence may be. It was limited in duration, a couple of minutes. Instead, the court relied on live testimony at a lengthy suppression hearing, uncontested documentary evidence, and the jailhouse phone calls to establish the facts of this case that gave rise to its legal conclusions that any objectively reasonable officer would have executed the arrest warrant in this manner and that consent was effective and voluntarily given. Uh, to the extent that we should decide that the defining the area of the cartilage is pertinent here, uh, I'm not getting into whether it is or it isn't right now. Uh, what does, what does the government have to say about the record regarding, uh, what, what was the cartilage and what was, was the vehicle parked on, on cartilage? How far did it extend in this fairly confined, uh, area around the trailer? I have a factual and a legal response to that. The record has no evidence pertaining to cartilage because it wasn't contested in the district court. The record at page 60 shows that he claimed, I was seized in my home. There was no argument or evidence put forth as to the nature of the area where the truck was parked. So we don't have a record to decide that issue. Um, as far as legally, that's a fact question. We don't have any facts to decide that on. So he would have to show plain error on a cartilage determination without any facts to support it. But the government would submit that this is a quintessential open fields scenario. Isn't, isn't, isn't there something in the record? And I'm asking you to, you know, correct me. I'm recalling that the truck was maybe parked in some kind of separate gravel area, but only a few feet from the door. I mean, tell us what the record does say about that. The best evidence we have is the video and it shows a number of trailers parked in an open field. This is a farm. This is Whitley Farms. There are animal cages. There are trailers. There are no improvements. There's no driveway, no gravel, no enclosure, no fencing, no attempt to make the, the truck was pulled up 10 feet from the trailer and just parked there. This is, I mean. Could anybody park there? Like my driveway. People can't just park in it if they feel like it. Correct. So, so you're, so there really is, is not a cartilage in your view. Nope. Because this is just a generic area that a bunch of people and tigers are all walking around in and parking in. There are no improvements. There's no attempt to protect his privacy interest. Evans and Bean. So is that the equivalent of just sort of an apartment complex where there's just random parking with, with that. Parking on a public street. It is quintessential open field. This is a field with a trailer on it. There are no improvements. This is not. Your argument is there's no cartilage argument, even if there had been evidence, because the reality is there wasn't a cartilage in this particular place. That's correct. Ultimately, our position is that in home, outside the home, cartilage seized, not seized, all authorized by the administrative arrest warrant. It was issued in compliance with a just emphatic congressional mandate to enforce our immigration laws that has the longstanding sanction of time. So all of these issues are unnecessary for the court to resolve  in this case in the manner and means that it was. If I can't answer anything else for the court, the government will cede the remainder of its time, but we would ask the court to affirm the district court in all respects. All right. Thank you, Ms. Graham. Ms. Penrose, you say time for rebuttal. I'm going to start by asking you about the quote that was referred to, and I see that it's in your reply brief at page 21, where you do cite the Cameron case, and you place the word judicial in brackets. Tell us about why you did that and whether that's accurate. Your Honor, Cameron see those were judicial warrants. The court required a warrant, and in nearly every instance where you see in the United States Supreme Court jurisprudence the word warrant, it presumes a judicial warrant. Even an administrative warrant may go before a neutral and detached magistrate. The fact that it's- Well, but I mean the case at hand, the case today talks about the distinction between judicial and administrative warrants, but you cited a Supreme Court case and inserted the word judicial. You did put it in brackets. I put it in brackets, Your Honor. Absolutely. Why did you do that? I mean, you're embellishing your own case, but you're misrepresenting what the Supreme Court said. Certainly not the intent. The facts of the case, as I understand them in camera, was the parties had to go before a neutral and detached magistrate to assess what the probable cause was to get a building permit, that there's probable cause of a need for a building there. So it presupposes a judicial warrant. That is why I put the phrase in brackets. So if we go to the camera, we will see discussion about judicial warrants somewhere there? No, Your Honor. It's presupposed. So if the court wants to put camera to the side, I'd also like to address your question. Well, I think you misled us by inserting that word. I hope you don't tell your law students that they're supposed to do that when they brief cases. Judge Smith, I certainly did not intend to mislead the court. And as I said, when you read the facts of camera, it presumes judicial warrant. In many Supreme Court cases, they simply use the shorthand warrant. And then when you go further and you dig deeper, the word judicial may or may not be used. That is precisely why I put it in brackets. Payton and Welch eradicated Abel's dicta. Judge Smith, you asked about dicta. And you said the Fifth Circuit has precedent that requires following Supreme Court dicta where it's weathered the test of time. But the Payton case and the Welch case indicate that a judicial warrant is required to enter the home. Malagerio is not contesting that these administrative warrants standing alone are improper or unconstitutional. They are absolutely not. Judge Haynes, you asked whether that good faith could be relied upon when these officers knew they were violating federal policy. And co-counsel said, no, they did an operational risky. I would ask the court to go to page 139 and 140 of the record. There is cited the FLEC training material and the FLEC video on page 139. On page 140, the letter, the DH letter to Representative Zoe Longren says that an administrative warrant does not permit home entry. So if- They did not enter the home on the basis of the warrant. They claim a voluntary consent. That's a separate issue. But at that moment, they did not enter the home. They have him open the door and tell him to come out. So if they are banned from entering the home, they didn't do it. Now, obviously, later we have this argument about whether it was a voluntary consent. They did enter with his consent. That's a separate question. But they didn't go barging in and then hand him the warrant. You're absolutely correct from a factual perspective. But it's tantamount to home entry when you surround a home at daybreak and bang on the door. Well, I mean, lawyers are lawyerly. And the fact is the word entry means entry. And when you're standing at the door, you're not entering. So if there was a trespass statute that said entering a home is trespass and I stood at someone's door, I would not be liable for trespass. Actually, in Hardeen's, Justice Scalia suggests just the opposite, that you can go up to the front door, but you can't do things other people wouldn't do. I think it's also important to note in the record that this is not a generic open field. Officer Round testified he had to get permission from Mr. Whitley, the owner of this farm, to open a gate. Okay, but so he did have permission to be in what you're calling the curtilage because the owner of that premise has let him in. But the owner doesn't... The problem is we're not even sure there's a curtilage here because of that, because we're talking about a field that Whitley owned and let them in. So only if this is owned by Malagirio is there an issue. And I understand the trailer, if you're leasing the trailer or whatever, but where is there evidence of the curtilage? Your Honor, I see my time is up. Would you like a response to that question? Yeah, go ahead and answer it, huh? I think the video provides the best answer and I think there's also testimony from Mr. Radden or Mr. Malagirio, and I don't recall which at this moment, indicating that this trailer in this space was solely under the custody of Mr. Malagirio. So the Stoner case is analogous where the clerk to a hotel can't give the police the ability to come see my hotel room. The owner of the larger property can't give permission to go into the driveway. They can give permission to walk around the hallway of the hotel. Absolutely, Your Honor, that's correct. Thank you. Thank you, Ms. Penrose. Your case is under submission. The remaining case for today, Stoto v. Ulysses Bautista.